# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Detention of

RICHARD A. RUDE,

          Appellant,

)
)
)
)
)
)
)
)
)
)
)

No. 69061-2-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: January 27, 2014

APPELWICK, J. — Rude appeals his commitment as a sexually violent predator. The State's expert diagnosed him as suffering from paraphilia not otherwise specified (nonconsent) and antisocial personality disorder. Rude argues that these diagnoses violated his due process rights, because they are invalid, insufficiently precise, and not recognized by the psychiatric profession. Rude also argues that the State's expert testified to details of his past acts based on prejudicial hearsay and not tied to any professional opinion. Rude further asserts that the prosecutor, in effect, told the jury that it could convict based on any condition that predisposed him to engage in acts of predatory violence. He contends that this constituted prosecutorial misconduct and violated his right to a unanimous jury verdict. We affirm.

## FACTS

This appeal arises from Richard Rude's involuntary commitment as a sexually violent predator (SVP), pursuant to chapter 71.09 RCW.

Rude has three convictions for sexually violent offenses. At 18, he forcibly raped a 16 year old girl with another man while intoxicated. Rude and his friend took turns holding the girl down while the other raped her. Rude pleaded guilty to rape in the second degree in 1981. His 10 year prison sentence was suspended in lieu of treatment as a sexual psychopath at Western State Hospital (WSH).

While out of custody and awaiting admittance at WSH, Rude sexually assaulted a woman he drove home in a taxi cab. He pleaded guilty to attempted rape in the second degree. The court sentenced to Rude to five years in prison, concurrent with his prior 10-year sentence. Both sentences were suspended on the condition that he participate in the sexual psychopath treatment program at WSH.

After about a year at WSH, Rude was accused of trying to force another patient to perform oral sex on him. Rude admitted to punching the man, though all but once denied the sexual advances.[1] As a result, Rude's suspended sentence was revoked and he was sent to prison to serve his 10 year sentence.

In June 1994, after Rude's release from prison, he committed another rape. The victim was in the Skagit Speedway parking lot and had lost track of her friend. Rude offered to drive her around to look for her friend, but once she got in his truck, he sped

---

[1] Several other participants in the WSH treatment program grilled Rude about the allegation for three days. Following this questioning, Rude admitted to the sexual assault. However, at all other times Rude maintained that the complainant came on to him.

away to a remote gravel pit. Rude made the victim take off her shirt and told her to perform oral sex. When she refused, Rude punched her in the face. Rude then raped her orally, vaginally, and anally.[2] Rude pleaded guilty to rape in the first degree. The court sentenced him to 194 months in prison followed by two years of community placement.

In August 2008, Rude's cellmate, John Frost, reported that Rude sexually assaulted him. Frost claimed that they had an altercation that led to Rude "shadow boxing" him. Frost tried to push Rude away, but Rude grabbed Frost, pulled Frost down on his bed, and "shoved his fingers in [Frost's] ass." Frost struggled and eventually kicked over Rude's television, breaking it. Rude then became angry and hit Frost in the face. Rude was charged with an infraction for assaulting Frost.

On August 13, 2010, the State petitioned to have Rude involuntarily committed as a sexually violent predator, pursuant to chapter 71.09 RCW. The trial court found probable cause to support the petition and detained Rude at the Special Commitment Center pending trial.

Dr. Kathleen Longwell, a clinical psychologist, evaluated Rude and testified as the State's expert at trial. Dr. Longwell has extensive experience in the evaluation, diagnosis, and treatment of sex offenders. To determine whether Rude met the SVP criteria, she reviewed approximately 3,000 pages of records, including criminal records, police reports, legal documents, medical and treatment records, previous psychological evaluations, and prison records. Longwell explained that these records are the kind

---

[2] Rude's account of the offense differed from the victim's account.

typically relied on by experts in SVP evaluations. She also conducted an in-person interview with Rude.

Dr. Longwell testified that these records formed the basis of her opinion that, to a reasonable degree of psychological certainty, Rude suffers from paraphilia not otherwise specified (NOS) (nonconsent), frotteurism, antisocial personality disorder (ASPD), as well as alcohol and cocaine dependence in institutional remission. She believed that Rude experiences an

> underlying internal drive towards forcing himself on nonconsenting persons, the paraphilia NOS. And that part of the fuel that goes towards acting on that drive is both subst[ance] use, dependency, alcohol-cocaine dependence, and the Antisocial Personality Disorder. So it is not the Antisocial Personality Disorder or the substance abuse in itself that predisposes him to future sexually violent offenses.

She testified that these diagnoses constitute mental abnormalities, which together cause "significant difficulties for [Rude] in controlling sexually violent behavior." Using actuarial instruments, Dr. Longwell predicted that Rude's risk of sexual recidivism is very high.

In reaching this opinion, Dr. Longwell reviewed criminal records showing that, as a juvenile, Rude pleaded guilty to making sexually obscene phone calls to women. Rude admitted to making these harassing phone calls. Dr. Longwell also considered Rude's juvenile conviction of indecent liberties. He pleaded guilty after reports of 20 to 30 incidents where he approached women in a parking lot and grabbed their breasts or slapped their buttocks. Rude also admitted to approaching women in parking lots and touching them on the posterior.

Dr. Longwell also reviewed records indicating that Rude was detained by police after he allegedly cornered a woman in a laundromat and she started screaming. Rude confirmed that he was involved in an altercation in a laundromat, but explained that he thought the woman was afraid someone was coming after her and started screaming. In addition, Dr. Longwell examined records from WSH indicating that Rude began having fantasies involving rape when he was an adolescent. Rude admitted in these records that the notion of controlling a woman and seeing fear in her eyes was sexually arousing to him. Dr. Longwell also considered Rude's convictions for sexual violence, along with the alleged sexual assault that led to his expulsion from WSH.

Dr. Longwell explained that the standard manual used by mental health professionals for diagnosis is the Diagnostic and Statistical Manual of Mental Disorders, currently in its fourth text revision (DSM or DSM-IV-TR). The current version of the DSM was published in 2000 by the American Psychiatric Association (APA). Dr. Longwell acknowledged that there is disagreement among mental health professionals regarding the diagnosis of paraphilia NOS (nonconsent).

Dr. Christopher Fisher testified as Rude's expert psychologist. Dr. Fisher also reviewed thousands of pages of records in evaluating Rude. He interviewed Rude and spoke with Rude's father, wife, and daughter. He diagnosed Rude with ASPD, as well as alcohol and substance abuse, based on his past behaviors. However, Dr. Fisher believed that Rude's ASPD went into remission as he aged.

Dr. Fisher also diagnosed Rude with sexual abuse of an adult. He believed that this is not a mental illness, but rather a reason why a person might go see a psychologist. Dr. Fisher disagreed with Dr. Longwell's diagnosis of paraphilia NOS

5

(nonconsent). He described the NOS category as a "wastebasket diagnosis," generated primarily for purposes of insurance billing. He testified that when the third revision of DSM was published, there was controversy as to whether rape was a paraphilia. However, Dr. Fisher acknowledged that paraphilia NOS (nonconsent) is a valid diagnosis that he would make in certain circumstances, specifically when there is evidence of sexual fantasies or urges.

Dr. Fisher also took issue with Dr. Longwell's actuarial predictions. Contrary to Dr. Longwell, he did not believe that Rude would commit future acts of sexual violence.

The jury found Rude to be a sexually violent predator beyond a reasonable doubt. The trial court entered an order committing Rude as a sexually violent predator under RCW 71.09.060. Rude appeals.

## DISCUSSION

### I.   Paraphilia NOS (nonconsent) and Antisocial Personality Disorder Diagnoses

Rude argues that his involuntary commitment based on the diagnoses of paraphilia NOS (nonconsent) and ASPD violates his Fourteenth Amendment right to due process of law. He contends that these two diagnoses are overbroad, insufficiently precise, and not accepted in the psychiatric profession. We review alleged due process violations de novo. Post v. City of Tacoma, 167 Wn.2d 300, 308, 217 P.3d 1179 (2009).

Civil commitment of an SVP must satisfy both statutory and constitutional requirements. Washington defines an SVP as "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual

violence if not confined in a secure facility." RCW 71.09.020(18). "Personality disorder" means:

> an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has onset in adolescence or early adulthood, is stable over time and leads to distress or impairment. Purported evidence of a personality disorder must be supported by testimony of a licensed forensic psychologist or psychiatrist.

RCW 71.09.020(9). By contrast, "mental abnormality" is defined as "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to the commission of criminal sexual acts in a degree constituting such person a menace to the health and safety of others." RCW 71.09.020(8).

Due process requires that an individual be both mentally ill and presently dangerous before being committed indefinitely. In re Det. of Marshall, 156 Wn.2d 150, 157, 125 P.3d 111 (2005). Under Kansas v. Crane, evidence is constitutionally sufficient to commit an SVP only if it is "sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." 534 U.S. 407, 413, 122 S. Ct. 867, 151 L. Ed. 2d 856 (2002). The Washington Supreme Court likewise recognizes that "the jury's finding that an SVP suffers from a mental illness, defined under our statute as a 'mental abnormality' or 'personality disorder,' coupled with the person's history of sexually predatory acts, must support the conclusion that the person has serious difficulty controlling behavior." In re Det. of Thorell, 149 Wn.2d 724, 742, 72 P.3d 708 (2003).

However, due process safeguards in the area of involuntary commitment "are not always best enforced through precise bright-line rules." Crane, 534 U.S. at 413. States have considerable leeway in defining the personality disorders and mental abnormalities that make an individual eligible for commitment. Id. And, "the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law." Id.

A. Paraphilia NOS (nonconsent)

Rude argues that paraphilia NOS (nonconsent) is not recognized by the psychiatric profession or the DSM-IV-TR. He contends that it is an unreliable, invalid diagnosis that does not distinguish him from the dangerous but typical recidivist convicted of sexually violent offenses. He specifically objects to the NOS and nonconsent diagnosis.

Despite Rude's argument, Washington courts have recognized paraphilia NOS (nonconsent) as a valid, diagnosable disorder and upheld involuntary commitments on that basis. In Young, the Washington Supreme Court rejected the argument that a diagnosis of paraphilia NOS (nonconsent) was invalid, because it did not appear in the then-current edition of the DSM:

> "In using the concept of 'mental abnormality' the legislature has invoked a more generalized terminology that can cover a much larger variety of disorders. Some, such as the paraphilias, are covered in the DSM-III-R; others are not. The fact that pathologically driven rape, for example, is not yet listed in the DSM-III-R does not invalidate such a diagnosis. The DSM is, after all, an evolving and imperfect document. Nor is it sacrosanct. Furthermore, it is in some areas a political document whose diagnoses are based, in some cases, on what [APA] leaders consider to be practical realities. What is critical for our purposes is that psychiatric and psychological clinicians who testify in good faith as to

8

mental abnormality are able to identify sexual pathologies that are as real and meaningful as other pathologies already listed in the DSM."

In re Pers. Restraint of Young, 122 Wn.2d 1, 28, 857 P.2d 989 (1993) (emphasis in original) (quoting Alexander D. Brooks, The Constitutionality and Morality of Civilly Committing Violent Sexual Predators, 15 U. PUGET SOUND L. REV. 709, 733 (1992)). Thus, inclusion in the DSM is not definitive for diagnosing a mental illness.

As recently as 2011, we also rejected the argument that paraphilia NOS (nonconsent) is not a valid diagnosis. In re Det. of Berry, 160 Wn. App. 374, 380-81, 248 P.3d 592, review denied, 172 Wn.2d 1005, 257 P.3d 665 (2011). In Berry, we noted that paraphilia NOS appears in the DSM-IV-TR. Id. at 381. The DSM-IV-TR defines paraphilia as "recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving 1) nonhuman objects, 2) the suffering or humiliation of oneself or one's partner, or 3) children or other nonconsenting persons that occur over a period of at least 6 months." DSM-IV-TR at 566 (emphasis added). Based on the emphasized language, DSM-IV-TR plainly recognizes paraphilia nonconsent. And, paraphilia NOS is a "residual category in the DSM-III-R which encompasses both less commonly encountered paraphilias and those not yet sufficiently described to merit formal inclusion in the DSM-III-R." Young, 122 Wn.2d at 29. The DSM-IV-TR provides a number of examples of paraphilia NOS,[3] but clearly states that the category is not limited to that list. DSM-IV-TR at 576. Therefore, we held in Berry that "[t]he omission

---

[3] "Examples include, but are not limited to, telephone scatologia (obscene phone calls), necrophilia (corpses), partialism (exclusive focus on part of body), zoophilia (animals), coprophilia (feces), klismaphilia (enemas), and urophilia (urine)." DSM-IV-TR at 576.

of 'nonconsent' or 'rape' from these examples does not prove it is an invalid diagnosis." 160 Wn. App. at 381-82.

The Seventh Circuit also recently held that a paraphilia NOS (nonconsent) diagnosis did not violate an SVP's due process rights. McGee v. Bartow, 593 F.3d 556, 580-81 (7th Cir. 2010). The McGee court held that, based on United States Supreme Court precedent, paraphilia NOS (nonconsent) "is not so unsupported by science that it should be excluded absolutely from consideration by the trier of fact." Id. at 580. The court reached this conclusion primarily because of the Supreme Court's repeated recognition that states must have appropriate room to make practical, common-sense judgments about the evidence presented in commitment proceedings. Id. The existence of professional debate over paraphilia NOS (nonconsent) does not mean that the diagnosis is "'too imprecise a category'" such that it runs afoul of due process. Id. at 581 (quoting Kansas v. Hendricks, 521 U.S. 346, 373, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997) (Kennedy, J., concurring)).

Dr. Longwell testified that Rude suffers from paraphilia NOS (nonconsent), based on her professional opinion and her review of Rude's records. She believed that Rude's paraphilia, combined with his ASPD and substance addiction, greatly impair his ability to control his sexually violent behavior. Dr. Fisher disagreed with Dr. Longwell's diagnosis, but acknowledged that he considered paraphilia NOS (nonconsent) a valid diagnosis in some circumstances. Rude cross-examined Dr. Longwell about the diagnosis and Dr. Fisher testified to its shortcomings. The controversy surrounding paraphilia NOS (nonconsent) went to the weight of the diagnosis, not its admissibility.

10

Berry, 160 Wn. App. at 382. The State's reliance on the paraphilia NOS (nonconsent) diagnosis did not violate Rude's due process rights.

## B. Antisocial Personality Disorder

Rude argues that commitment based on his ASPD diagnosis violates his due process rights, because the diagnosis is too imprecise to differentiate him from the dangerous but typical recidivist in a criminal conviction. Specifically, he refers to Dr. Longwell's testimony that as much as 60 percent of the male prison population may suffer from ASPD.

Washington courts have rejected this argument. In Young, the appellants argued that it is impermissible to civilly commit someone who has an "antisocial personality," because that condition is not a mental disorder. 122 Wn.2d at 37 n.12. Unlike "antisocial behavior," the Young court explained, ASPD is a recognized mental disorder. Id. ASPD is defined in the DSM-IV-TR as "a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood." DSM-IV-TR at 701.

Moreover, we need not decide whether Rude's diagnosis of ASPD alone suffices for due process purposes. Brown v. Watters, 599 F.3d 602, 615 (7th Cir. 2010). Dr. Longwell also diagnosed Rude with paraphilia, as well as alcohol and cocaine dependence. She testified that the combination of these three mental illnesses resulted in Rude's impaired ability to control his sexually violent behavior. Dr. Fisher likewise diagnosed Rude with substance abuse and sexual abuse of adults. Numerous Washington and federal courts have upheld involuntary commitments based on the combination of ASPD and paraphilia. See, e.g., id. at 615; McGee, 593 F.3d at 559,

11

581; In re Det. of Stout, 159 Wn.2d 357, 363, 380-81, 150 P.3d 86 (2007); Berry, 160 Wn. App. at 376-77. We therefore find no due process violation based on Rude's ASPD diagnosis.

## II. Expert Testimony Based on Hearsay

Rude argues that, in violation of ER 703 and ER 705, Dr. Longwell recounted prejudicial hearsay, violating his right to a fair trial. Rude specifically objects to Dr. Longwell's testimony about his cornering the woman in a Texas laundromat, his 1981 rape of a 16 year old girl, his conviction for second degree attempted rape, and the reasons behind his expulsion from WSH. He argues that Dr. Longwell's recounting of these incidents was not tied to any specific professional opinion and should not have been admitted.

Though Rude attempts to characterize this issue as a constitutional one, we review a trial court's decision to admit evidence for abuse of discretion. In re Det. of Coe, 175 Wn.2d 482, 492, 515, 286 P.3d 29 (2012). Discretion is abused if it is exercised on untenable grounds or for untenable reasons. Id. at 492.

ER 703 permits an expert to base an opinion on facts or data not otherwise admissible if they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." A trial court may allow an expert to reveal the underlying basis an opinion if doing so will help the jury understand the expert's opinion. ER 705; Coe, 175 Wn.2d at 513. Such disclosure is permissible even if the information would be inadmissible as substantive evidence. Coe, 175 Wn.2d at 513. For instance, an expert may offer an opinion based on hearsay data that would otherwise be inadmissible. Marshall, 156 Wn.2d at 162. The trial court need only give

an appropriate limiting instruction explaining that the jury is not to consider this revealed information as substantive evidence. Coe, 175 Wn.2d at 513-14. However, the expert may not simply summarize and reiterate all manner of inadmissible evidence. Marshall, 156 Wn.2d at 162.

In Marshall, the State's psychologist, Dr. Amy Phenix, reviewed Marshall's criminal and psychiatric history, including police reports, legal documents, treatment and medical records, juvenile records, as well as psychiatric evaluations. Id. at 154-55. At the commitment trial, Dr. Phenix testified that these are the types of records that professionals in her field rely on when evaluating potential SVPs. Id. at 155. She explained that her review of these records led her to conclude that Marshall suffered from pedophilia, sexual sadism, and paraphilia NOS (nonconsent). Id. On appeal, Marshall argued that Dr. Phenix's testimony should have been excluded, because she related inadmissible hearsay as factual assertions. Id. at 162. The Washington Supreme Court disagreed and held that Dr. Phenix's testimony was consistent with ER 705, because she discussed otherwise inadmissible testimony only to explain the basis for her expert opinion. Id. at 163.

Similarly, in Coe, Dr. Phenix disclosed 20 unadjudicated rapes to the jury in explaining her conclusion that Coe suffered from exhibitionism and paraphilia NOS (nonconsent, urophilia, and coprophilia).[4] 175 Wn.2d at 488-89, 512-13. Dr. Phenix testified that she relied on the unadjudicated rapes in diagnosing Coe and explained

---

[4] Such testimony is undoubtedly prejudicial. However, "[i]n assessing whether an individual is a sexually violent predator, prior sexual history is highly probative of his or her propensity for future violence." Young, 122 Wn.2d at 53.

13

that it is common for experts in SVP proceedings to do so. Id. at 514. The Washington Supreme Court held that the trial court did not err in allowing such testimony. Id.

The trial court in Coe also gave an appropriate limiting instruction:

"Dr. Phenix is about to testify regarding the factual bases of her opinion. You may consider this testimony only in deciding what credibility and weight should be given to the opinions of Dr. Phenix. You may not consider it as evidence that the information relied upon by the witness is true or that the evidence described actually occurred."

Id. Citing Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), Coe challenged the idea that a limiting instruction could ever prevent the jury from considering the disclosed facts as evidence. Id. The Bruton Court held that a jury cannot be expected to ignore the confession of a nontestifying codefendant that expressly implicates the defendant. Id. at 514. The Coe court distinguished Bruton, reasoning that Bruton "involves a narrow exception to the general rule that juries follow instructions." Id. at 514-15. That exception did not exist in Coe. Id. at 515.

Rude argues that the Coe court's reading of Bruton is incorrect. He contends that Bruton does not in fact outline a narrow exception to the general presumption that juries follow instructions, but is rather a broader recognition that a limiting instruction is a type of placebo or "'judicial lie.'" (quoting Burton, 391 U.S. 132 n.8.) Whether or not Rude is correct, Coe is binding precedent and controls here.

At trial, Dr. Longwell testified that she reviewed approximately 3,000 pages of documents, including Rude's criminal records, police reports, treatment reports, and medical records. She acknowledged that such documents are typically relied on by professionals in her field when evaluating potential SVPs. Indeed, Dr. Fisher relied on the same documents in evaluating Rude. Dr. Longwell testified that these records

14

formed the bases of her opinion that Rude suffers from paraphilia NOS, frotteurism, ASPD, and substance dependence.

Dr. Longwell further testified that there was minimal specific evidence of Rude's sexual fantasies or urges, so she had to evaluate his behavior. Pattern of behavior, she explained, is instructive in determining whether an individual has a mental disorder. Often, SVPs deny sexual fantasies and urges, so experts "have to look at circumstances of the offenses and the pattern of the offenses [to see] what was propelling those offenses." Dr. Longwell opined that Rude's pattern of sexual offenses, beginning with the juvenile convictions and escalating to first degree rape decades later, "indicates that he took tremendous risks in committing these sex offenses. There must have been a strong internal drive to take this kind of risk and do it repeatedly." Furthermore, Dr. Longwell testified that all the incidents she accounted at trial showed a pattern of nonconsensual sexual conduct. This in turn informed her professional opinion that Rude suffered from uncontrollable, violent sexual urges. Thus, the hearsay evidence that Dr. Longwell recounted was clearly tied to her professional opinion of Rude's mental illnesses. Rude's argument fails.

Furthermore, the trial court gave an appropriate limiting instruction to the jury:

> Generally witnesses testify to only things they observe. However some witnesses are permitted to give their opinions in addition to their observations.
>
> In order to assist you in evaluating an opinion a witness may be allowed to give the basis for the opinion. In some circumstances testimony about basis for an opinion is not appropriate for you to consider for other purposes. In that instance I will call to your attention the limited purpose for which evidence may properly be considered. Dr. Kathleen Longwell is about to testify regarding information she relied on for the basis for her opinion. You may consider this testimony only in deciding

what credibility and weight should be given to the opinions of Dr. Longwell. You may not consider it as evidence that the information relied upon by the witness is true or that events described actually occurred.

The latter portion of this instruction is almost identical to the one given in Coe and deemed to be proper by the Washington Supreme Court.

We hold that the trial court did not abuse its discretion in allowing disclosure of otherwise inadmissible hearsay evidence, because Dr. Longwell used the incidents to explain the basis for her expert opinion and the court gave an appropriate limiting instruction.

## III.    Prosecutor's Rebuttal Argument

Rude argues that it constituted prosecutorial misconduct and violated his right to jury unanimity when the State told the jury in rebuttal that they could commit him if they found beyond a reasonable doubt that he suffered from any "condition" that caused him serious difficulty in controlling his sexually violent behavior.

### A. Prosecutorial Misconduct

Rude argues that the State's argument "amounted to an exhortation to the jury to commit Mr. Rude if [it] simply [was] afraid of him and believed he might reoffend," which violated his right to due process. Rude contends that this urged the jury to ignore the evidence and created an impermissible risk that his commitment order was not based on mental illness, but some amorphous, undefined condition.

Prosecutorial misconduct is grounds for reversal if the prosecutor's conduct was both improper and prejudicial. State v. Monday, 171 Wn.2d 667, 675, 257 P.3d 551 (2011). In closing argument, the prosecutor has wide latitude in making arguments and drawing reasonable inferences from the evidence. State v. Fisher, 165 Wn.2d 727, 747,

202 P.3d 937 (2009). A prosecutor is also entitled to make a fair response to the arguments of defense counsel. State v. Russell, 125 Wn.2d 24, 87, 882 P.2d 747 (1994). A defendant suffers prejudice only when there is a substantial likelihood that the prosecutor's conduct affected the jury's verdict. Monday, 171 Wn.2d at 675.

We evaluate a prosecutor's conduct in the full trial context, including the evidence presented, the total argument, the issues in the case, and the jury instructions. Id. Here, context is key. In closing, defense counsel argued that the State was required to prove beyond a reasonable doubt that Rude suffered from paraphilia NOS:

> So even though the instructions say that a person can be a sexually violent predator if he suffers from a mental abnormality or personality disorder, in this case the evidence has shown that there's only one crime -- one diagnosis that would really make or predispose or set anyone in motion to committing a sex act, and that's Paraphilia NOS.
>
> And that's why in this case the state needs to prove that definition -- or not that definition -- that diagnosis beyond a reasonable doubt.

In rebuttal, the State responded to this argument:

> I just want to get to a couple of major points, and the first being a misstatement of the law that Mr. Mooney gave you.
>
> Mr. Mooney told you that what you had to find beyond a reasonable doubt was that Dr. Longwell had diagnosed Mr. Rude with Paraphilia Not Otherwise Specified, that that diagnosis had to be found beyond a reasonable doubt. That's not what the law says.

Defense counsel objected, stating, "I argued the facts." The trial court overruled, explaining, "This is a fair comment on the evidence." The State continued,

> What you have to find is that Mr. Rude has a condition, a condition that predisposes him. And you remember, we put the slide up with [the] definition of mental abnormality. The DSM, the testimony of the experts, the diagnoses, they're all just a guide.

17

Defense counsel objected again and the court excused the jury to consider the objection.

During recess, defense counsel argued that the State was essentially telling the jury to make up its own mental abnormality, violating United States Supreme Court precedent. The State explained that its argument was that the jury is

> required to find by statute a mental abnormality, it is defined, and they can use the evidence that was presented by anybody to determine if it's met that definition. They can give the DSM, you know, the credibility as a learned treatise, they can follow what Mr. Mooney is telling them and disregard it.

After argument, the court noted the objection and ordered the State to proceed with rebuttal.

The State resumed its rebuttal argument:

> But what you're asked to find in this case is, does Mr. Rude have a mental abnormality as defined by the statute? You heard a lot of debate over what are the criteria for the diagnosis that Dr. Longwell made, but what you didn't hear any debate over is that there are individuals out there, there are individuals out there who have a paraphilic interest in rape.
>
> Is there controversy over this issue? Sure. But you weigh the evidence credibility of the experts. You weigh the testimony, and you determine what decision you make in this case.

The State's rebuttal argument was a correct statement of the law, as set forth in the jury instructions. The jury instructions required the State to prove that "Richard Rude suffers from a mental abnormality or a personality disorder, which causes serious difficulty in controlling his sexually violent behavior." The instructions further mandated that the State prove that "this mental abnormality or personality disorder makes Richard Rude likely to engage in predatory acts of sexual violence if not confined to a secure

18

facility." Defense counsel's closing argument advocated a different standard and urged the jury to ignore these instructions. The State's rebuttal was a fair response to that argument and properly stated the law. Moreover, Dr. Longwell testified that both paraphilia and ASDP independently constitute mental abnormalities, which combine to impair Rude's control of his sexually violent behavior. The State drew reasonable inferences from this testimony to rebut defense counsel's argument.

The State also did not encourage the jury to find that Rude had some amorphous condition. Rather, the State correctly reminded the jurors that they must apply the statutory definition of mental abnormality. The jury instructions defined mental abnormality in the language of the statute as "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit criminal sexual acts to a degree that makes the person a menace to the health and safety of others." RCW 71.09.020(8). The State continually tied the word "condition" back to this definition.[5] The State did not encourage the jurors to ignore the evidence, but rather weigh it and decide for themselves whether Rude suffered from a mental abnormality based on the evidence presented. The State's rebuttal argument was not improper, and therefore does not constitute prosecutorial misconduct.

---

[5] Moreover, these instructions comport with United States Supreme Court precedent, which holds:

> It is enough to say that there must be proof of serious difficulty in controlling behavior. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.

Crane, 534 U.S. at 413.

B. Jury Unanimity

Rude argues that although the State presented substantial evidence of his paraphilia NOS, ASPD, and substance abuse, the State did not prove that ASPD or substance abuse alone predisposed him to have difficulty controlling his sexually violent behavior. He contends that, because the State failed to prove these alternative means, his right to a unanimous jury verdict was violated.

However, Rude misconstrues the nature of these alternative means. He is correct that jury unanimity is required in SVP commitment proceedings. In re Det. of Halgren, 156 Wn.2d 795, 807-08, 132 P.3d 714 (2006). And, an SVP determination may be accomplished by alternative means: "mental abnormality" and "personality disorder" are two distinct means of establishing the mental illness element in SVP cases. Id. at 810. Contrary to Rude's argument, however, these two means "may operate independently or may work in conjunction . . . the mental illnesses are not repugnant of each other and may inhere in the same transaction." Id. (emphasis added). The combined effect of these two mental illnesses may then satisfy the requirement that the "person is likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18); see Halgren, 156 Wn.2d at 810.

In other words, when the State alleges both alternative means, it does not need to establish that a personality disorder and a mental abnormality each independently predispose the individual to sexual violence. Rather, the State needs to prove that the individual suffers both a personality disorder and a mental abnormality. The State may then show that the combined effect of these two mental illnesses predisposes the individual to sexual violence. This is precisely what the State did here. Dr. Longwell

20

testified that she believed that Rude's paraphilia, ASPD, and substance abuse combined to impair his ability to control his sexually violent behavior.

Thus, we need only consider whether the State presented sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that Rude had both a mental abnormality and a personality disorder. See Halgren, 156 Wn.2d at 811-12. Rude concedes, and we agree, that the State presented substantial evidence of his paraphilia, ASPD, and substance abuse. Br. of Appellant, 41. Therefore, our inquiry is at an end.

We affirm.

_Appelwick, J._

WE CONCUR:

_Spearman, J._                    _Leach, C.J._