# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

In the Matter of the Care and Treatment of Shawn Torlif Daily, Appellant.

Appellate Case No. 2022-000371

---

Appeal From Spartanburg County
R. Keith Kelly, Circuit Court Judge

---

Opinion No. 6061
Submitted May 1, 2024 – Filed June 12, 2024

---

## REVERSED AND REMANDED

---

Appellate Defender Lara Mary Caudy, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Senior Assistant Deputy Attorney General Deborah R.J. Shupe, both of Columbia, for Respondent.

---

**PER CURIAM:** Shawn Torlif Daily appeals his involuntary commitment under the Sexually Violent Predator Act (the SVP Act),[1] arguing the circuit court erred in admitting evidence of the results of a penile plethysmograph (PPG) test he underwent because the evidence was unreliable. We reverse and remand.

## FACTS

Daily pled guilty to three counts of lewd act on a minor. Prior to his release, the State petitioned the circuit court to order Daily's evaluation under the SVP Act.

---

[1] S.C. Code Ann. §§ 44-48-10 to 44-48-180 (Supp. 2023).

After a probable cause hearing, the court ordered evaluation and appointed Dr. Christopher Gillen, a psychologist with the Department of Mental Health, to evaluate Daily. Dr. Gillen issued an evaluation, finding Daily did not meet the criteria for commitment under the SVP Act. The State sought the independent evaluation of Dr. Emily Gottfried of the Medical University of South Carolina (MUSC). Dr. Gottfried's evaluation included PPG testing. After Dr. Gottfried's evaluation, Daily filed a pretrial motion to suppress testimony related to the PPG testing and results. The State filed a memorandum in opposition to the motion to suppress.

At a pretrial hearing, Daily argued the PPG test was not scientifically reliable, it was useful for treatment but not evaluation, Daily faced contempt if he did not submit to the test, and it was not relevant. Daily further asserted the probative value of the evidence was substantially outweighed by its prejudicial effect. The State argued the test was reliable, the results were only one factor Dr. Gottfried relied on, and the prejudicial effect did not outweigh the probative value. The State proffered Dr. Gottfried's testimony.

Dr. Gottfried testified the PPG has been widely used since 1950, not only regarding sexual offending but also to address erectile dysfunction and general sexual wellbeing. She explained she and everyone involved in the PPG test at the Sexual Behaviors Clinic and Lab (SBCL) at MUSC were clinically certified to perform and interpret the test, and the SBCL had been certified by the manufacturer of the PPG, Limestone Technologies. In addition, she testified all equipment used was calibrated three times before each test and measures were taken to make sure each administration of the test was valid.

Dr. Gottfried also testified the Association for the Treatment of Sexual Abusers (ATSA) published guidelines for assessment and treatment purposes, including the use of the PPG. She opined the ATSA concluded the PPG was standardized and empirically supported, but it should not be used alone in concluding risk or diagnosis and she noted she used it in conjunction with other evaluation methods. She explained she was part of an international standardization research group for the PPG. In addition, she had "about 36 peer-reviewed publications or book chapters in peer-reviewed scholarly books" regarding the PPG. She had performed more than fifty pre-commitment evaluations using PPGs and also contracted with U.S. Federal Probation and Pretrial Services system for evaluations. Dr. Gottfried next testified about a diagnostic manual, which recognized the use of the PPG, and a clinical science handbook that found the PPG important in the evaluation and treatment of those being considered for civil commitment as a sexual predator.

She explained a methodology of using children's voices during the stimuli tests that could be tailored to an examinee's offending pattern, Real Child Voices, and opined that SVP programs in Minnesota, California, Illinois, New York, and possibly Missouri used the methodology for treatment programs.[2]  She testified Real Child Voices had been peer reviewed.  Dr. Gottfried also used  the Marshall stimulus test, which she described as "developed . . . a long time ago."[3]  Dr. Gottfried opined the PPG was generally accepted in the mental health and medical field.  However, she admitted the PPG had standardization issues and it did not always have expected results.  After taking the matter under advisement, the court denied the motion to suppress.

At trial, Dr. Gottfried was qualified by stipulation as an expert in forensic psychiatry in sexual behaviors.  Dr. Gottfried testified she was certified in 2018 to administer the PPG by a psychologist at Limestone Technologies.  She acknowledged "the PPG has been criticized for some standardization issues."  In addition, "some offenders don't show expected arousal pattern."  She explained a sexual offender against children may not show sexual arousal under the PPG because "not everybody who offends against children offends because they are sexual[ly] attracted or aroused by them . . . ."

Dr. Gottfried testified Daily's results from the PPG testing "were right in line with his offenses."  According to Dr. Gottfried, Daily "had a clinically significant sexual arousal to trials featuring sexual activity with a female infant, a preschool-aged female child, and a grammar school or elementary school-aged child.  And those were really consistent with his offense behaviors."  She stated Daily did not show clinically significant arousal to consenting adults.  Dr. Gottfried diagnosed Daily with pedophilic disorder, exclusive type, sexually aroused to female prepubescent children.  She opined the disorder was treatable but difficult to treat, and she testified Daily had not had any treatment.[4]  Dr. Gottfried rated Daily in the

---

[2] Dr. Gottfried stated the jurisdictions she mentioned used the PPG "for precommitment, but when I discuss the programs, they only do treatment there."
[3] The Marshall test "features a monotone male voice . . . reading sexual scenarios."  The Real Child Voices is "slide plus audio," using photos of like victims, such as a female child in a bathing suit used for an examinee whose victim was a similar age and gender.
[4] Dr. Gottfried noted Daily had not received treatment even though it was offered to him while he was incarcerated.  She also noted Daily was "a person who maybe genuinely wants . . . not to reoffend, but has no idea how to manage that arousal that he has. . . .  He clearly needs treatment for it."

average-risk range for reoffending (approximately five percent) based on the actuarial assessments given, but found he had a high risk to reoffend based on her overall review.  She opined Daily met the criteria to be found a sexually violent predator under the SVP Act and that he had "a mental abnormality that ma[de] him likely to reoffend if not committed and [given] treatment."

Dr. Gillen was qualified without objection as an expert in clinical forensic psychology and testified he diagnosed Daily with pedophilic disorder.  His actuarial assessments also measured Daily in the average risk to reoffend of less than five percent.  He testified there is no cure for pedophilic disorder but explained it could be treated by teaching strategies to manage deviant arousal to prevent reoffending.  Dr. Gillen testified that once Daily was released, he would have approximately three years remaining on probation, which would include intensive supervision, sex offender treatment, and GPS monitoring.  Dr. Gillen opined Daily was not likely to reoffend.  The jury found Daily was a sexually violent predator under the SVP Act, and the circuit court ordered his commitment.  This appeal followed.

**STANDARD OF REVIEW**

In *Matter of Bilton*, this court described the standard of review for evidentiary rulings in an SVP case:

> The standard of review for evidentiary rulings is very deferential.  "The admission or exclusion of evidence is a matter within the trial court's sound discretion, and an appellate court may only disturb a ruling admitting or excluding evidence upon a showing of a 'manifest abuse of discretion accompanied by probable prejudice.'"  *State v. Commander*, 396 S.C. 254, 262–63, 721 S.E.2d 413, 417 (2011) (quoting *State v. Douglas*, 369 S.C. 424, 429, 632 S.E.2d 845, 848 (2006)).  "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006).

432 S.C. 157, 161–62, 851 S.E.2d 442, 444 (Ct. App. 2020).  In addition, "[a] trial [court's] decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in exceptional circumstances."  *State v.*

*Collins*, 409 S.C. 524, 534, 763 S.E.2d 22, 28 (2014) (quoting *State v. Adams*, 354 S.C. 361, 378, 580 S.E.2d 785, 794 (Ct. App. 2003)).

**LAW/ANALYSIS**

Daily argues the circuit court erred in admitting evidence of the PPG test because it was unreliable and the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. We agree.

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Rule 702, SCRE. "To admit expert testimony under Rule 702, the proponent . . . must demonstrate, and the trial court must find, the existence of three elements: 'the evidence will assist the trier of fact, the expert witness is qualified, and the underlying science is reliable.'" *State v. Wallace*, 440 S.C. 537, 544, 892 S.E.2d 310, 313 (2023) (quoting *State v. Council*, 335 S.C. 1, 20, 515 S.E.2d 508, 518 (1999)). A trial court considers these factors in determining the admissibility of scientific evidence: "(1) the publications and peer review of the technique; (2) prior application of the method to the type of evidence involved in the case; (3) the quality control procedures used to ensure reliability; and (4) the consistency of the method with recognized scientific laws and procedures." *Council*, 335 S.C. at 19, 515 S.E.2d at 517.

We recognize there may be contrary authority finding the PPG is reliable and probative. *See In re Det. of Herrick*, 393 P.3d 879, 885 (Wash. Ct. App. 2017) (affirming the use of the PPG as a diagnostic test in a commitment proceeding, stating the Washington Supreme Court had accepted the PPG as used for diagnosis and the Washington legislature had "expressly authorized the use of PPG testing as part of the evaluative process"); *In re Commitment of Sandry*, 857 N.E.2d 295, 309 (Ill. Ct. App. 2006) (stating "a significant subset of experts considers PPG testing a useful tool for treating and evaluating sex offenders").

However, we agree with this court's opinion in *Matter of Bilton*, which noted "[t]he test is controversial and has been criticized for a lack of standardization and for being subject to manipulation." 432 S.C. 157, 162, 851 S.E.2d 442, 444 (Ct. App. 2020). Furthermore, our court in *Bilton* stated, "[c]ourts have noted that PPGs are routinely used as a tool in treatment programs[, and] . . . with limited exceptions[, . . .] courts have 'uniformly' declared that PPG test results are 'inadmissible as evidence because there are no accepted standards for this test in the scientific

community.'" *Id.* at 162–63, 851 S.E.2d at 444 (quoting *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1266 (9th Cir. 2000)); *see also Berthiaume v. Caron*, 142 F.3d 12, 17 (1st Cir. 1998) ("[The PPG] is widely used in the scientific community for the treatment of pedophilia; its use for screening is debatable and the scientific community is not of one mind . . . ."); *United States v. Powers*, 59 F.3d 1460, 1471 (4th Cir. 1995) (affirming the district court's ruling that the PPG test fails the "scientific validity" prong of the test which provides the standard for the admissibility of such scientific evidence); *Leftwich v. State*, 538 S.E.2d 779, 781 (Ga. Ct. App. 2000) (finding the court had already "noted that the reliability of test results obtained on the penile plethysmograph had not been scientifically established" and the proponent of the evidence also failed to demonstrate the evidence was outside of the knowledge of the average juror); *State v. Spencer*, 459 S.E.2d 812, 815 (N.C. Ct. App. 1995) (affirming the exclusion of the results of a PPG test because "the evidence before [the trial court] by no means established the reliability of the plethysmograph; there is a substantial difference of opinion within the scientific community regarding the plethysmograph's reliability to measure sexual deviancy"); *see generally* Renee Sorrentino, M.D., *Sex Offenders and the Law*, 39 Vt. B.J. 26, 26 (2013) ("Studies measuring sexual arousal by penile plethysmography (circumferential measurement of penile tumescence as a measure of sexual arousal) define improvement as a reduction in deviant sexual arousal. . . . However, the use of penile plethysmography is not widely accepted by the scientific community because of the lack of reliability between the different types and models of plethysmography in addition to debate over the validity and appropriate use of penile plethysmography.") (footnotes omitted); Major Christopher Mathews, et al., *Debunking Penile Plethysmograph Evidence*, 28 NO. 2 The Reporter 11, 11–12 (2001) (stating "the use of the penile plethysmograph as a predictive or forensic tool fails to meet the relevant legal standards for admissibility and has been repeatedly rejected by the scientific community); *id.* at 13 (stating due to "the serious issues undermining [the] reliability" of the PPG, "it is not surprising that state courts have repeatedly excluded penile plethysmograph evidence. Federal courts have likewise rejected the test.") (footnote omitted); Myers, et al., *Expert Testimony in Child Sexual Abuse Litigation*, 68 Neb. L. Rev. 1, 134–35 (1989) (stating that a problem with the reliability of PPG testing is that penile response is subject to voluntary control, and the test should not be used to determine whether or not an individual has engaged in deviant behavior). Because we find the PPG is not reliable, as required by Rule 702, we find the trial court abused its discretion in admitting the PPG test results.

Having found error in the admission of the PPG, we must next consider whether it was prejudicial or constituted harmless error. "A fundamental principle of

appellate procedure is that a challenged decision must be both erroneous and prejudicial to warrant reversal." *In re Gonzalez*, 409 S.C. 621, 636, 763 S.E.2d 210, 217 (2014). "A harmless error, by definition, is an error that is not prejudicial." *State v. Charping*, 313 S.C. 147, 159, 437 S.E.2d 88, 95 (1993) (Goolsby, A.J., concurring), *overruled on other grounds by Franklin v. Catoe*, 346 S.C. 563, 552 S.E.2d 718 (2001). "Whether an error is harmless depends on the circumstances of the particular case. No definite rule of law governs this finding; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case." *In re Care & Treatment of Harvey*, 355 S.C. 53, 62–63, 584 S.E.2d 893, 897 (2003) (quoting *State v. Mitchell*, 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985)).

Here, Dr. Gottfried testified she met with Daily twice and her technicians met with him on two other occasions; she evaluated his criminal history, his incarceration, and other records; and she reviewed Dr. Gillen's evaluation. She performed three categories of assessments: self-reporting; the PPG; and her own clinician scores. According to Dr. Gottfried, Daily's self-reporting was defensive, exhibiting "a really high level of denial related to past sexual interest or urges and things that might be considered deviant." He also "placed responsibility for his behavior on having had too much alcohol or drugs [Ambien]." Dr. Gottfried testified Daily attempted to minimize his behavior "by indicating that he didn't plan [his assaults], that he slipped one time, made a mistake, and he didn't know how the sexual things actually ended up happening."

However, Dr. Gottfried was also the State's sole witness and a significant portion of her testimony centered on the PPG test. She emphasized to the jury that the PPG was an "objective test of male sexual arousal" and claimed it is "really, really important to objectively know what this person is aroused by . . . [a]nd so the PPG is going to give you data about today on . . . what they were aroused by in the laboratory." She also told the jury that "the PPG has the greatest validity and reliability . . . ."

To determine if the erroneous admission of the PPG qualifies as harmless error depends on "whether beyond a reasonable doubt the trial error did not contribute to the guilty verdict." *State v. Tapp*, 398 S.C. 376, 389–90, 728 S.E.2d 468, 475 (2012). Although Dr. Gottfried testified she did not rely exclusively on the PPG in making her evaluation, we cannot fairly say that beyond a reasonable doubt, the PPG test results did not contribute to the jury's verdict. *See Bilton*, 432 S.C. at 168, 851 S.E.2d at 447 ("Many cases recount the special solicitude juries afford

testimony that has the appearance of scientific evidence."); *id.* (finding prejudicial error in the admission of PPG test results).

**CONCLUSION**

For the foregoing reasons, the commitment order is reversed and remanded for a new trial.

**REVERSED AND REMANDED.**

**THOMAS, MCDONALD, and VERDIN, JJ., concur.**